**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

CoStar Group, Inc., and CoStar Realty
Information, Inc.,

          Plaintiffs,

        v.

Baron Realty Groups, LLC, Adam Shapiro,
Patrick Pascal, Gloryvette Navarro, Imaginary
Wave Technology, LLC, Matthew Martini, and
John Does 1–10,

          Defendants.

Civil Action No. 19-cv-1400

**JURY TRIAL
DEMANDED**

---

## COMPLAINT

Plaintiffs CoStar Group, Inc. and CoStar Realty Information, Inc. (together, "CoStar"),

by their attorneys Schindler Cohen & Hochman LLP and Williams & Connolly LLP (*pro hac

vice* forthcoming), for their Complaint against Defendants Baron Realty Groups, LLC; Adam

Shapiro; Patrick Pascal; Gloryvette Navarro; Imaginary Wave Technology, LLC; Matthew

Martini; and John Does 1–10 (collectively, "Defendants"), allege as follows:

1.      Through a multifaceted and unlawful scheme, Defendants misappropriated

enormous amounts of proprietary commercial real estate information from CoStar. This lawsuit

seeks to hold Defendants liable for their misconduct and the damage they have caused CoStar.

\* \* \* \* \*

2.      CoStar is the nation's leading provider of commercial real estate information,

operating the most comprehensive commercial real estate information database in the world.

The database contains information on millions of real estate properties and transactions across

the country and powers analytics and marketplaces offered to CoStar's customers. These

customers—which range from government agencies, to national and regional real estate brokerages, to investment funds—pay significant fees to subscribe to the database and gain access to this trove of data and CoStar's analytic tools.

3.    The components of Defendants' scheme are many and bespeak Defendants' coordinated attempts to breach their agreements with CoStar, circumvent the protections in CoStar's system, and harvest CoStar's data:

4.    *First*, Baron Realty subscribed to CoStar's database approximately one year ago, thus gaining access to the wealth of commercial real estate information in it.  CoStar now knows that Baron Realty's subscription was a ruse.  The firm has not paid one cent of the tens of thousands of dollars in fees it contracted to pay CoStar.  It subscribed, instead, to gain access to the database so that it could illegally download CoStar's data for its own use.  Once it became clear that Baron Realty would not pay its fees, CoStar terminated Baron Realty's access.

5.    *Second*, Baron Realty and its employees illegally downloaded ***tens of millions of data points*** from CoStar's database.  Baron Realty's employees used "scraping" and other technological tools as the instruments of their theft.  Scraping is an automated computer process that bombards a website with information requests at speeds that human users could never achieve.  Scraping thus allows the automated collection of vast amounts of information, which a human could not otherwise efficiently collect.

6.    But that is not all.  To ensure that its efforts to scrape CoStar's database were most effective, Baron Realty retained a professional database harvester to assist.  While providing his services, the database harvester accessed CoStar's database using CoStar credentials issued to Baron Realty employees—even though CoStar strictly prohibits users from sharing their credentials.

7.      *Third*, Baron Realty and its employees used the stolen data to create a derivative database of commercial real estate information—granting Baron Realty and others access to CoStar's information at any time, without paying any subscription fees.  CoStar alleges that Baron Realty, its employees, and unknown other individuals (John Does 1–10) used and continue to use the copycat database as a substitute for legitimate CoStar access, guaranteeing themselves free and unlimited access to CoStar's valuable and proprietary information.  The misuse of CoStar's intellectual property extends beyond its real estate data, however.

8.      *Fourth*, Baron Realty and its employees violated the Copyright Act by displaying CoStar-copyrighted photographs on Baron Realty's website and Instagram account without CoStar's authorization.  Among other things, subscribers to CoStar's database pay to access a library of millions of professionally shot CoStar-copyrighted photographs of real estate properties.  Although subscribers have a limited license to use CoStar's images for marketing purposes, Baron Realty infringed CoStar's copyrights by displaying CoStar's copyrighted images after CoStar terminated the license.  It continues to display CoStar's images even today.

9.      Defendants' conduct, unsurprisingly, contravenes federal intellectual-property statutes, violates the common law, and breaches Defendants' contractual obligations.  Defendants' free-riding has caused financial harm to CoStar and its paying subscribers.  As a consequence of Defendants' unlawful actions, CoStar is entitled to, among other things, damages and injunctive relief to prevent continued irreparable harm to its business.

**THE PARTIES**

10.      CoStar Group is a corporation organized and existing under the laws of the State of Delaware with its principal place of business and corporate offices located at 1331 L Street, N.W., Washington, District of Columbia 20005.

3

11.     CoStar Realty Information is a corporation organized and existing under the laws of the State of Delaware with its principal place of business and corporate offices located at 1331 L Street, N.W., Washington, District of Columbia 20005.  It is a wholly owned subsidiary of CoStar Group.

12.     Baron Realty is a limited liability company organized under the laws of New York that markets commercial real estate properties across the United States.  It was founded in 2008 and employs more than 100 agents, according to the LinkedIn profile of Baron Realty's managing partner.  According to its registration with the New York Secretary of State, Baron Realty resides at 2929 Expressway Drive North, Suite 310, Hauppauge, New York 11788.  It has no registered agent.

13.     Shapiro is the managing partner of Baron Realty.  He is domiciled in New York and resides at 1119 Court North Drive, Melville, New York 11747.

14.     Pascal is the New York Boroughs Director for Baron Realty.  He is domiciled in New York and resides at 12 Jamaica Avenue, Greenlawn, New York 11740.

15.     Navarro was an investment sales associate for Baron Realty.  She is domiciled in New York and resides at 59 Pine Drive, East Northport, New York 11731.

16.     Imaginary Wave Technology is a limited liability company organized under the laws of New York that offers technology consulting services including database and data-mining optimization.  According to its registration with the New York Secretary of State, Imaginary Wave Technology resides at 4 Glenridge Avenue, Stony Brook, New York 11790.  It has no registered agent.

17.     Martini is a principal and the Chief Technology Officer of Imaginary Wave Technology.  He is domiciled in New York and resides at 4 Glenridge Avenue, Stony Brook,

New York 11790.

18.     John Does 1–10 are individuals or entities that have used a derivative database populated with CoStar's proprietary information and knew or should have known the derivative database contained CoStar's trade secrets.  The identities of John Does 1–10 are not known to CoStar and will be revealed through discovery.

## JURISDICTION AND VENUE

19.     The Court has federal-question jurisdiction over this action under 28 U.S.C. § 1331 because CoStar alleges violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, and the Copyright Act, 17 U.S.C. § 101 *et seq.*  The Court has supplemental jurisdiction over the remaining state-law claims under 28 U.S.C. § 1367 because they arise from a common nucleus of operative fact to the federal-law claims.

20.     The Court has personal jurisdiction over Defendants.  Baron Realty and Imaginary Wave Technology are New York limited-liability companies, have their principal places of business in New York, and transacted business in New York.  Shapiro, Pascal, Navarro, and Martini also transacted business in New York, and each is domiciled in New York.  On information and belief, John Does 1–10 transacted business in New York through their use of Baron Realty's derivative database.  The business transacted by Baron Realty, Imaginary Wave Technology, Shapiro, Pascal, Navarro, Martini, and John Does 1–10 in New York bears a substantial nexus to CoStar's claims.  Through those acts, Baron Realty, Imaginary Wave Technology, Shapiro, Pascal, Navarro, Martini, and John Does 1–10 purposely availed themselves of the privilege of conducting activities within New York and invoked the benefits and protections of New York's laws.

21.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) and 1400 because a

substantial part of the events or omissions giving rise to this action occurred in this judicial district.

FACTUAL ALLEGATIONS

I.   COSTAR, ITS BUSINESS, AND ITS INTELLECTUAL PROPERTY

    A.   CoStar's Business.

22.   Like many technology companies, CoStar's business began in its founder's basement with a simple idea:  Empower commercial real estate brokers with researched, unbiased commercial property information.  Since its founding, and thanks to the investment of nearly five billion dollars and the efforts of nearly four thousand employees, CoStar has become the leading provider of commercial real estate information, marketplaces, and analytics.

23.   CoStar's products revolve around a central asset:  a database of commercial real estate information and photographs.  The database is part of an integrated suite of online services that includes information about space available for lease, tenants, comparable sales, and properties for sale.  CoStar generates and updates the database's content at a cost of over $600 million each year.

24.   Over ten thousand CoStar researchers have contributed to the subscription database since its creation, adding information about nearly five million properties, taking over twelve million photographs, and driving and flying over two million miles per year.  CoStar's researchers collect this information through many means, including in-person site inspections and targeted calls to individual commercial real estate owners, developers, and brokers.

25.   The subscription database provides exceptional benefits to CoStar's paying customers.  Because CoStar has professionally researched commercial real estate for the last thirty years, it offers its customers decades of data on transactions and market trends.  With CoStar's transactions data, customers can assess the value of real estate and separate a good

6

investment from a bad one.

26.     CoStar's subscribers also rely on the database to identify contacts for listings and properties.  CoStar's research staff develops relationships with real estate constituents across the United States.  Through interviews and other research techniques, CoStar researchers obtain the names and contact information of the owners, buyers, sellers, and representatives of particular listings and properties.  This information, which oftentimes is not publicly available or readily ascertainable, is used by CoStar's subscribers to facilitate connections for their clients.

27.     The subscription database also has a positive impact on consumer welfare in the larger commercial real estate ecosystem.  CoStar's subscription database provides greater transparency in the form of readily available, professionally researched, and regularly updated commercial real estate information.  The existence of this information has made traditional commercial real estate transactions more efficient and has also facilitated a more diverse range of commercial real estate deals.  The net result is greater liquidity and significantly mitigated risk in one of the world's most valuable and important asset classes:  commercial real estate.

28.     The important role that CoStar plays in the commercial real estate market is demonstrated by the extent to which its users interact with the service.  Each day, users conduct nearly nine million searches for commercial real estate on CoStar products, including its subscription database.  CoStar estimates that its products play a part in supporting one trillion dollars of commercial real estate transactions, including leases, sales, and mortgage originations, in the United States each year.

**B.     CoStar's Intellectual Property.**

29.     CoStar's offerings are possible only because of the information and CoStar-copyrighted photographs included in its database, which is unrivaled in scope, depth, and quality in the commercial real estate industry.  The information is professionally researched data and the

CoStar-copyrighted images are professionally shot photographs of office buildings, retail space, warehouses, construction sites, land, and other locations.

30.     The professionally researched database includes data that is varied in its scope. One real estate transaction can easily yield hundreds of data points collected by CoStar.  For example, the data includes for-sale or for-lease listing prices; the sizes of lots, floors, and suites; and details on various features and amenities.  If a landlord rents space in a building, CoStar not only tracks the specifics of that lease transaction, but also provides detailed information about other spaces and transactions in the building and in other similar properties.  CoStar gathers this information from multiple sources, including by conducting interviews, to collect accurate, non-public details.

31.     CoStar's database also includes various valuation measures that are difficult to obtain and extremely valuable to all types of commercial real estate professionals.  Data, such as specific sale conditions, buyer and seller motivations, and capitalization rates, is painstakingly collected item-by-item, usually through telephonic interviews.  For CoStar, this is a time-consuming and costly process.  CoStar researches the identities of and contact information for the owners, buyers, and sellers involved in sale and lease transactions.  Most of these owners, buyers, and sellers are anonymous partnerships or limited liability corporations, but through individualized research and interviews, CoStar's researchers uncover and report the "true" identities of the individuals behind these entities.

32.     CoStar also collects some of its real estate data from public sources like SEC filings and state and local government reports.  These documents contain valuable information about real estate transactions that would take an enormous investment of time to locate by an untrained reader (or be missed altogether).  To gather this information and separate the wheat

from the chaff, CoStar employs a dedicated unit within its research department that is trained in public-records analysis.  This group's work allows CoStar's subscribers to view and understand key data from scores of public records in an instant on a centralized interface.  By comparison, the databases maintained by some of CoStar's competitors merely collect or link to these documents, leaving the identification of key facts, analysis, and aggregation to the reader.

33.     CoStar's database extends beyond the facts of specific transactions and properties—whether culled from public sources, obtained in private interviews, or uncovered as a result of meticulous and time-consuming research—as CoStar creates its own property-specific content.  For example, CoStar's database includes the CoStar Building Rating System$^{SM}$, which is the commercial real estate industry's first nationally-consistent building quality rating system.  It evaluates every building in CoStar's database on a five star scale.  CoStar's proprietary formula for ratings takes into account multiple factors including whether the building is new or refurbished, its energy efficiency, the quality of the materials used in construction, the efficiency of floor plans, and the desirability of the location relative to the market.

34.     In each market CoStar researches, CoStar endeavors to compile data on every piece of commercial real estate and every relevant transaction.  This results in the most comprehensive data set commercially available for neighborhoods and business districts nationwide, unlocking additional value for CoStar's subscribers.  For example, if a broker is working on a building sale in Brooklyn, she can use CoStar to generate a report with details on other active listings or off-market properties that meet her selected criteria.  A CoStar subscription can also be used to generate a list of useful contacts for marketing the property.

35.     In addition to the scores of data points CoStar collects on commercial real estate in the United States, CoStar's field researchers visit millions of properties a year to perform on-

site visual inspections and shoot professional photos.  The photographs, which number in the millions, are protected under the Copyright Act and regularly registered with the United States Copyright Office.

36.     CoStar's images can be viewed through the CoStar software used by subscribers to access the database.  CoStar subscribers also use these images under limited license in marketing materials for commercial real estate availabilities.  Commercial real estate professionals trust CoStar to create high-quality images, which is why many commercial real estate flyers and advertisements feature CoStar-owned photographs.

**C.     CoStar Protects its Valuable Commercial Real Estate Information at Great Cost.**

37.     Due in part to the type of brazen misconduct at issue here, CoStar has taken extensive measures to protect its researched information and prevent unauthorized access to its database.  Specifically, CoStar makes its database available only through limited licenses that obligate licensees to preserve the confidentiality of CoStar's data; the company also administers a robust anti-piracy program that identifies and remedies instances of intellectual property theft.

**1.     CoStar's License Agreements and Terms of Use.**

38.     CoStar protects its database by granting access through limited licenses.  The subscribers to CoStar's database must execute a license agreement that contains strict prohibitions on its use.  And every individual user of CoStar's website agrees to a limited license in CoStar's Terms of Use, which also contain strict prohibitions on use.

39.     While license agreements are executed by the entity or individual that subscribes to CoStar's database, each user assents to the Terms of Use through his or her use of the site.  The CoStar database login page states below the "Log In" button that by clicking "Log In," each user accepts CoStar's Terms of Use.  The text includes a hyperlink to the Terms of Use.  In

addition, users are advised of the binding nature of the Terms of Use before they first access the database.  The email containing the initial link to the database states that "[u]se is subject to the CoStar Terms of Use.  By logging in, you agree to be bound by such terms."

40. CoStar's users are also reminded of their obligation to abide by the Terms of Use throughout their use of the database.  For example, when a user attempts to export data from the database, text above the "Export" button informs users that "[e]xported data subject to restrictions.  See Terms of Use."  As with the login page, clicking the words "Terms of Use" displays the Terms of Use.  When users view results in the database, the bottom of results pages warns:  "By using this site, you agree to our Terms of Use."  This text also includes hyperlink to the Terms of Use.

41. The Terms of Use, as well as CoStar's license agreements, are carefully structured to ensure that everyone who uses CoStar's database has a clear duty to maintain the confidentiality of CoStar's proprietary information.  For example, although users can provide their clients with information about "particular properties," the database's analytics and market-level data must remain secret.[1]

42. CoStar strictly prohibits users from sharing access credentials with unauthorized persons.  CoStar's license agreements require the licensee to "ensure that access to and use of the Licensed Product, and the user names, passwords . . . used to access the Licensed Product are available only to Authorized Users, and will not allow anyone other than an Authorized User

---

[1] Ex. A (Baron Realty License Agreement), § 2; Ex. B (Terms of Use).  Exhibits A and B are, respectively, the license agreement executed by Baron Realty and the Terms of Use in effect during Baron Realty's use of CoStar's database.  Though CoStar periodically revises its license agreements and Terms of Use, each version of the contracts include a requirement to preserve the confidentiality of CoStar's data and a proscription against sharing access credentials, discussed below.

access . . . for any reason."[2]

43.     The Terms of Use bar authorized users from allowing other persons to access the database: "[Y]ou shall not . . . [p]rovide your Passcode or otherwise provide access to [the CoStar database] to any individual other than yourself . . . ."[3]  In addition, the Terms of Use prohibit persons who have received CoStar credentials that do not belong to them from accessing the database: "[Y]ou shall not . . . [a]ccess any portion of a Passcode Protected Product unless you are an Authorized User for such Passcode Protected Product using the Passcodes assigned to you by CoStar to access the components and services of the Passcode Protected Product that [the license agreement] authorizes you to access, subject to the terms contained therein and in these Terms of Use."[4]

44.     Separate from the Terms of Use, the account-creation email sent to new users warns that "[y]our UserName/Password are for your personal use only and may not be shared."

45.     Both the license agreements and the Terms of Use explicitly prohibit scraping.[5] The Terms of Use also forbid the use of "any data mining, gathering or extraction tool, or any robot, spider or other automatic device or manual process, to monitor or copy any portion of the Product or the data generated from it."[6]

46.     The license agreements and Terms of Use also preclude using CoStar data to create derivative databases.  Licensees may not "use any portion of the Licensed Product to

---

[2] Ex. A (Baron Realty License Agreement), § 1(d).

[3] Ex. B (Terms of Use).

[4] Ex. B (Terms of Use).

[5] Ex. A (Baron Realty License Agreement), § 2(c)(5); Ex. B (Terms of Use).

[6] Ex. B (Terms of Use).

create, directly or indirectly, any database or product."[7]  And under the Terms of Use, users cannot "create derivative works of the Product" or "[u]se or distribute any Information from the Product . . . to directly or indirectly create or contribute to the development of any database or product."[8]

47.     Finally, CoStar ensures that its users do not retain unauthorized access to CoStar data after the termination of a license by requiring users to delete and destroy CoStar data once their licenses have been terminated.[9]

## 2.     CoStar's Anti-Piracy Technology.

48.     In addition to the legal and contractual bars on intellectual-property abuse, CoStar employs technological barriers to unauthorized use and operates an anti-piracy program.

49.     CoStar's first security against unauthorized access is the requirement that users provide a password to access the site.  Each user must maintain his or her own individual password and, as stated above, is prohibited from allowing any other individual to use the credentials.  In addition to password protection, CoStar employs a variety of two-factor authentication systems, including unique text codes and scanning quick response codes.

50.     CoStar also employs third-party products to protect against unauthorized access. These include firewalls, anti-virus programs, and anti-malware programs.

51.     In addition to its state-of-the-art anti-piracy technology, CoStar operates its own anti-piracy program which includes monitoring suspicious activity and unauthorized uses of its subscription database.

---

[7] Ex. A (Baron Realty License Agreement), § 2(c)(2).

[8] Ex. B (Terms of Use).

[9] Ex. A (Baron Realty License Agreement), § 7; Ex. B (Terms of Use).

52.     Another prong of CoStar's anti-piracy efforts is education.  CoStar's website contains multiple pages of anti-piracy content that gives licensees guidance on the prevention of data theft by their users.  These pages describe best practices and identify commonly observed patterns of database theft.

53.     In addition to the contractual terms requiring licensees to delete data taken from CoStar at the conclusion of the license, CoStar protects itself by requiring licensees to agree to an audit right.  Under the audit right, licensees promise to cooperate in an audit of their systems that verifies the licensee has purged their computers of all CoStar-owned data and information.[10] CoStar's license agreements also require licensees to provide, if requested, an affidavit certifying that the licensee has permanently deleted all CoStar-owned data and information.[11]

54.     CoStar has taken such extensive measures to protect its database (and the researched information and CoStar-copyrighted photographs included within) because it derives significant economic value from the fact that the database content is not generally or readily ascertainable.

55.     The benefits that CoStar's products provide to its customers and the market at large are a direct result of the company's efforts—undertaken over decades at a cost of billions of dollars—to research, collect, and create data and images.  The protection of data and copyrighted images—and CoStar's ability to vindicate its rights in that content—is therefore critically important.

## II.    BARON REALTY SIGNED UP FOR COSTAR ONLY TO IGNORE ITS CONTRACTUAL OBLIGATIONS

56.     In December 2017, Baron Realty's managing partner, Adam Shapiro, executed a

---

[10] Ex. A (Baron Realty License Agreement), § 7.

[11] Ex. A (Baron Realty License Agreement), § 7.

license agreement on behalf of Baron Realty.  In that agreement, CoStar authorized Shapiro and four other Baron Realty employees to access and use CoStar's subscription database.

57.     The Baron Realty License Agreement required Baron Realty to pay monthly for a one-year term.[12]  In the summer of 2018, Baron Realty added two additional authorized users to its account at an additional expense per month per additional user.

58.     Baron Realty has not paid any of its license fees, and CoStar thus terminated the Baron Realty License Agreement on September 18, 2018.  Baron Realty still has not paid ***any*** of its license fees.

59.     Because of its default (and the violations detailed below), Baron Realty is responsible for license fees for its entire one-year-term license.  Although CoStar initially provided the first three months of Baron Realty's license for free as part of a promotion, its multiple violations of its agreement obligates Baron Realty to pay for those three months.  Baron Realty presently owes CoStar more than $30,000 simply by virtue of its unpaid licensing fees.

## III.   WITH THE ASSISTANCE OF A PROFESSIONAL DATABASE SCRAPER, BARON REALTY AND ITS EMPLOYEES STOLE REAMS OF COSTAR DATA

60.     Shapiro and Patrick Pascal, the New York Boroughs Director at Baron Realty, used their CoStar access to improperly extract CoStar's data from the database.  They pulled data through an automated harvesting technology called "scraping," and by abusing a feature CoStar provides with its services that allows CoStar's customers to efficiently use the database.

61.     Shapiro and Pascal did not act alone.  They hired a professional database scraper, Matthew Martini, and his company, Imaginary Wave Technology, to accomplish industrial-grade scraping.

---

[12] Ex. A (Baron Realty License Agreement).

A.      **Baron Realty, Shapiro, and Pascal Scraped CoStar's Database.**

62.      Scraping can be difficult to identify in isolation, but among its hallmarks are lengthy use sessions and high quantities of website "hits" that only can be explained by non-human activity.  A "hit" is a request made to CoStar's web server for information—such as data or a photograph.  CoStar logs all hits and session durations for all of its licensed users.  CoStar also records the number of records each user exports.

63.      The facts here show that Shapiro and Pascal wrongfully used their subscriptions to download tens of millions of data points belonging to CoStar through scraping and CoStar's "limited-export" feature, which allows subscribers to create a downloadable spreadsheet containing a small amount of CoStar's data.

64.      The access logs for Shapiro's account reflect non-human activity beginning almost immediately after CoStar issued Shapiro his credentials.

65.      In the first two and a half months following the issuance of Shapiro's CoStar credentials, Shapiro's account was online for 758 hours and logged 294,638 hits.  By contrast, 95% of all active CoStar users log fewer than a couple of thousand hits per month.  Shapiro's account logged many of the 758 hours during sessions lasting 12 or more hours, which usually began in the afternoon hours one day and continued into the early morning hours of the next.

66.      Shapiro's account reflects especially suspicious activity around the Christmas and New Year's holidays, during which the account was online for 102 hours and logged 48,852 hits. For comparison, there were fewer than 75 hours of daylight in New York City during the same period.

67.      Shapiro's account did not even rest for the arrival of the New Year.  Shapiro's credentials began a session at 6:47 p.m. on New Year's Eve, concluding at 3:38 a.m. on New Year's Day.  While many Americans were watching the festivities in Times Square or sharing a

kiss with a loved one, Shapiro's account executed a 2,491-hit binge.

68.     Shapiro's product usage during this two-and-a-half month period was excessive—but it pales in comparison to his account usage, and that of Pascal, in the following spring, after Shapiro and Pascal engaged the services of a professional data harvester.

69.     Shapiro's account logged 336,147 hits in a two-month period in the spring of 2018 and spent 966 hours—more than forty 24-hour days—online.  According to Google Maps, one could walk from New York City to San Francisco in the same amount of time Shapiro's account spent actively crawling CoStar's database in those two months.  For one of those months, Shapiro's account was responsible for more hits than any other CoStar user in the United States.

70.     During the same two-month period, Pascal logged 297 hours of product usage and registered 179,476 hits.

71.     The volume and pattern of account use from the accounts belonging to Shapiro and Pascal thus indicate the use of automated scraping technology to collect information from CoStar's database.

72.     At the same time, Shapiro and Pascal abused CoStar's limited-export feature. Shapiro and Pascal pulled more than 1.3 million records through exports.  Many of the exports created by Shapiro and Pascal were at or near the 500-property limit for exports, which evidences Shapiro's and Pascal's exports were not for legitimate, individualized research purposes.  Rather, Shapiro and Pascal schemed to extract as much data in as little time as possible.

**B.      Baron Realty and its Employees Acquired Advanced Scraping Infrastructure From a Trained Data Harvester.**

73.     Baron Realty, Shapiro, and Pascal obtained professional database-scraping

services from Martini and his company Imaginary Wave Technology.

74.     Shapiro and another authorized user under Baron Realty's license, Gloryvette Navarro, then a Baron Realty investment sales associate, improperly shared their CoStar access credentials with Martini, permitting him to access CoStar's database.

75.     CoStar alleges that Martini used that access to design a professional-grade scraping script that could rapidly harvest vast quantities of CoStar's data.  And, CoStar believes, after developing the script, Martini transferred it to Baron Realty, Shapiro, and Pascal, thus arming them with the tools necessary to appropriate vast quantities of data.  The efficacy of Martini's script is evidenced by the prodigious feats of scraping Shapiro and Pascal achieved.

76.     Martini's collaboration with Baron Realty, Shapiro, Pascal, and Navarro was not his first taste of intellectual-property theft.  On his personal website, www.martini.net, Martini published the full text of a copyright-protected book, taking it down only when the book's publisher, Harcourt Trade Publishers, sent a demand letter.  Martini's recidivism underscores his willful and malicious violation of CoStar's intellectual property rights.

**C.     Baron Realty, Shapiro, Navarro, and Martini Violated CoStar's Prohibition on Unauthorized Access to the Database.**

77.     Baron Realty, Shapiro, and Navarro facilitated Martini's access of CoStar's database through a series of misrepresentations to CoStar and violations of the Baron Realty License Agreement and Terms of Use.

78.     As described above, CoStar's default login mode requires two-factor authentication.  In Baron Realty's case, each user was required to enter their username, password, and a code that CoStar sent via text message to the cellphone number belonging to the user.  The text-message code requirement ensures an unauthorized user cannot access the database with only the authorized user's password.

79.     Shapiro and Martini circumvented the two-factor authentication when Shapiro provided Martini with his password and the text-message code sent by CoStar to Shapiro.

80.     Later, Shapiro investigated the possibility of temporarily changing his cellphone number to a cellphone number belonging to Martini.  CoStar warned Shapiro that changing cellphone numbers to a number not associated with the account holder was forbidden during a call Shapiro had with CoStar's customer-service department.

81.     Undeterred by that warning, Shapiro's colleague, Navarro, changed her cellphone number to a number belonging to Martini and passed her account to Martini for Martini's use. Martini's cellphone was assigned to Navarro's account for over a month.  As cover, Navarro told a CoStar customer-service representative that her cellphone became unusable and she needed to change the number to her husband's phone in order to log in.

82.     When Martini logged in to CoStar's database with Shapiro and Navarro's credentials, he made fraudulent representations to CoStar.

83.     Every individual who seeks to access CoStar's database is directed to "Log In with *your* current CoStar username and password."  (Emphasis added.)  In response to this prompt, Martini repeatedly provided a username and password that did not belong to him but rather belonged to actual authorized users, Shapiro and Navarro—thereby falsely representing to CoStar that he was an individual authorized to access the database.  The specific dates and times of Martini's fraudulent misrepresentations are set forth in Exhibit C.

84.     Through his fraudulent misrepresentations, Martini and Imaginary Wave Technology received services from CoStar that otherwise would have required Imaginary Wave Technology to execute a license agreement with CoStar and pay license fees.

85.     At the time Martini logged in to CoStar's database, he was not (and knew he was

not) an authorized user; yet, he accessed the CoStar database for his benefit, and for the benefit of Baron Realty, Shapiro, Pascal, Navarro, Imaginary Wave Technology, and the Doe Defendants.

## IV.    BARON REALTY, SHAPIRO, PASCAL, NAVARRO, AND THE DOE DEFENDANTS USED AND ARE USING COSTAR'S STOLEN DATA IN AN ILLICIT DERIVATIVE DATABASE

86.    After stealing tens of millions of pieces of data from CoStar's database, Shapiro and Pascal combined the information they harvested from CoStar's database into an offline, derivative database hosted by Baron Realty.

87.    CoStar believes that Baron Realty, Shapiro, Pascal, Navarro, and the Doe Defendants continue to possess and use the derivative database for the benefit of themselves and Baron Realty, and as a substitute for a legitimate license to access CoStar's database.

88.    Baron Realty profits from the derivative database by using it to benefit its clients. Baron Realty's website boasts of the firm's access to "comprehensive local market intelligence." This statement, in CoStar's view, refers to the illicit derivative database created through Baron Realty and its employees' systemic harvesting.

## V.    THOUGH BARON REALTY'S LICENSE TO USE COSTAR'S INTELLECTUAL PROPERTY ENDED MONTHS AGO, BARON REALTY CONTINUES TO PUBLISH PHOTOGRAPHS OWNED BY COSTAR ON ITS WEBSITE

89.    By terminating Baron Realty's License Agreement, CoStar terminated Baron Realty's rights to use CoStar's intellectual property.

90.    The Baron Realty License Agreement allowed Baron Realty to "display solely on its own website photographs from the Licensed Product that depict properties that Licensee owns, controls, represents or holds exclusives . . . ."[13]  This right ceased when CoStar terminated

---

[13] Ex. A (Baron Realty License Agreement), § 2(c)(1)(ii).

the Baron Realty License Agreement on September 18, 2018.

91.     Since that time, however, Baron Realty has continued to display CoStar-copyrighted photographs on its website and on a social media account—and thus has infringed CoStar's copyrights.  CoStar has identified eighteen CoStar-owned images that Baron Realty has published without authorization:  sixteen on its website and two on a (now-disabled) Baron Realty Instagram Account.  Of the infringements, almost all bear CoStar's watermark.  CoStar alleges that Baron Realty and Shapiro know they were not authorized to copy, republish, display, or distribute CoStar's photographs after September 18, 2018.  These infringements are likely a fraction of the total number of CoStar photographs Baron Realty has improperly displayed.

92.     Exhibit D identifies each of Baron Realty and Shapiro's infringements.  Baron Realty and Shapiro copied, republished, distributed, and publicly displayed without authorization each of these photographs.

93.     By way of example, a copy of a CoStar-copyrighted image of a property located at 1061 Ranger Street, El Paso, Texas 79907 is displayed without authorization on Baron Realty's website.  Baron Realty's copy of the image includes the CoStar watermark, which is well-known throughout the industry, in the bottom right-hand corner of the image:

**CoStar-Copyrighted Photograph of 1061 Ranger Street, El Paso, Texas 79907**



**CoStar-Copyrighted Photograph Appearing on Baron Realty's Website[14]**



94.     By way of another example, a copy of a CoStar-owned image of a property

located at 176–178 Jericho Turnpike, Floral Park, NY 11001 was displayed without

authorization on a Baron Realty Instagram account, which has been disabled.  As with the above

example, Baron Realty's copy of the image includes the CoStar watermark in the bottom right-

hand corner of the image.

**CoStar-Copyrighted Photograph of 176–178 Jericho Turnpike, Floral Park, NY 11001**



---

[14] The infringement is found within "Multi Family" listings category available at
https://www.barongroups.com/sales (last accessed Mar. 7, 2019).

**CoStar-Copyrighted Photograph on Baron Realty's Disabled Instagram Account**[15]



95.      CoStar owns the exclusive rights in each of the photographs detailed in Exhibit D.

Prior to filing this suit, CoStar validly registered, or submitted a valid application for registration

for, each of the photographs detailed in Exhibit D with the United States Copyright Office.  A

valid registration was obtained or a valid registration application was submitted by CoStar for

each of these photographs prior to Baron Realty and Shapiro's first infringement of the

photograph.

96.      Baron Realty and Shapiro's infringement is willful, intentional, volitional, and of

a purposeful nature.

**CAUSES OF ACTION**

**FIRST CLAIM FOR RELIEF**
**Defend Trade Secrets Act, 18 U.S.C. § 1836**
**(Against Defendants)**

97.      CoStar repeats and realleges each and every allegation set forth above and

incorporates them herein by reference.

---

[15] The infringing post was available at https://www.instagram.com/p/BoEyY0jgh8E/ (last
accessed Nov. 23, 2018).

98.     The database described in the preceding paragraphs, along with other highly confidential and proprietary information, are owned by CoStar and constitute trade secrets.  The database includes, among other things, (a) details of real estate sales and lease transactions; (b) the sizes of buildings, land, and units; (c) the number of units or suites within buildings; (d) valuation measures; (e) vacancy rates and percentages; and (f) identifying and contact information for commercial real estate owners, buyers, sellers, and property managers, such as "true" buyer and seller information where the buyer or seller is a partnership or limited liability corporation.  In addition, the database comprises content created by CoStar, including ratings that are part of the CoStar Building Rating System[SM], which is the commercial real estate industry's first nationally consistent building quality rating system.

99.     CoStar's trade secrets would be difficult and expensive for a competitor to acquire by fair means.  CoStar spends a significant amount of money and effort in developing its trade secrets.

100.     CoStar's trade secrets were developed and are used in interstate and foreign commerce.

101.     CoStar's trade secrets derive independent economic value from not being generally known and not being readily ascertainable through proper means by others, as the information is extremely valuable to CoStar and constitutes information that is not widely known in the industry due to its unique nature and CoStar's significant efforts to protect and maintain its secrecy, as detailed above.  To obtain access to the database containing CoStar's trade secrets, CoStar's customers pay a significant subscription fee.

102.     At all times, CoStar has taken reasonable measures to keep secret its trade secrets, including by limiting access to licensed users, requiring licensed users to maintain the

confidentiality of CoStar's trade secrets, and requiring licensed users to access CoStar's trade secrets through a password-protected portal.  CoStar has detailed these efforts above.

103.     CoStar did not consent to Defendants acquiring, using, or disclosing CoStar's trade secrets except as provided in the Baron Realty License Agreement and Terms of Use.

104.     Baron Realty promised under the Baron Realty License Agreement, and Shapiro, Pascal, Navarro, and Martini promised under the Terms of Use, that they would not copy or scrape CoStar's trade secrets and would preserve the confidentiality of CoStar's trade secrets.  At all relevant times, Baron Realty, Shapiro, Pascal, Navarro, Imaginary Wave Technology, and Martini knew CoStar's trade secrets were confidential.

105.     The Doe Defendants knew or had reason to know that CoStar's trade secrets were confidential.

106.     Defendants knowingly used improper means to acquire, use, or disclose CoStar's trade secrets.  Specifically, Baron Realty, Shapiro, Pascal, Imaginary Wave Technology, and Martini used data-extraction technology to acquire trade-secret-protected data from CoStar's database.  Baron Realty, Shapiro, and Pascal put the information they extracted into a derivative database, which was used, or is being used, by Baron Realty, Shapiro, Pascal, Navarro, and the Doe Defendants.

107.     The conduct of Defendants constitutes knowing, willful, and malicious misappropriation.

108.     As a result of Defendants' misappropriation of CoStar's trade secrets, CoStar has suffered and will continue to suffer damages, and Defendants were unjustly enriched, in an amount to be determined at trial.

109.     As a result of Defendants' willful and malicious misappropriation of CoStar's

trade secrets, Defendants are liable for exemplary damages and attorney's fees.

110.    Defendants' misappropriation of CoStar's trade secrets has caused CoStar irreparable injury.  Unless restrained and enjoined, they will continue to misappropriate CoStar's trade secrets.  As CoStar's remedies at law are inadequate, CoStar is entitled to injunctive relief.

<u>**SECOND CLAIM FOR RELIEF**</u>
**Aiding and Abetting Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836**
**(Against Imaginary Wave Technology and Martini)**

111.    CoStar repeats and realleges each and every allegation set forth above and incorporates them herein by reference.

112.    Martini and Imaginary Wave Technology aided and abetted the misappropriation of CoStar's trade secrets by Baron Realty, Shapiro, Pascal, Navarro, and the Doe Defendants.

113.    As a result of Martini and Imaginary Wave Technology's aiding and abetting, CoStar has suffered and will continue to suffer damages, and Martini and Imaginary Wave Technology were unjustly enriched, in an amount to be determined at trial.

114.    As a result of Martini and Imaginary Wave Technology's willful and malicious aiding and abetting, Martini and Imaginary Wave Technology are liable for exemplary damages and attorney's fees.

115.    Martini and Imaginary Wave Technology's aiding and abetting has caused CoStar irreparable injury.  Unless restrained and enjoined, Martini and Imaginary Wave Technology will continue to aid and abet the misappropriation of CoStar's trade secrets.  As CoStar's remedies at law are inadequate, CoStar is entitled to injunctive relief as well.

<u>**THIRD CLAIM FOR RELIEF**</u>
**Misappropriation of Trade Secrets under New York Law**
**(Against Defendants)**

116.    CoStar repeats and realleges each and every allegation set forth above and

incorporates them herein by reference.

117.    The database described in the preceding paragraphs, along with other highly confidential and proprietary information, are owned by CoStar and constitute trade secrets.  The database includes, among other things, (a) details of real estate sales and lease transactions; (b) the sizes of buildings, land, and units; (c) the number of units or suites within buildings; (d) valuation measures; (e) vacancy rates and percentages; and (f) identifying and contact information for commercial real estate owners, buyers, sellers, and property managers, such as "true" buyer and seller information where the buyer or seller is a partnership or limited liability corporation.  In addition, the database includes content created by CoStar, including ratings that are part of the CoStar Building Rating System$^{SM}$, which is the commercial real estate industry's first nationally consistent building quality rating system.

118.    CoStar's trade secrets would be difficult and expensive for a competitor to acquire by fair means.  CoStar spends a significant amount of money and effort in developing its trade secrets.

119.    CoStar's trade secrets are currently in use in CoStar's business.

120.    CoStar's trade secrets derive independent economic value from not being generally known and not being readily ascertainable through proper means by others, as such information is extremely valuable to CoStar and constitutes information that is not widely known in the industry due to its unique nature and CoStar's significant efforts to maintain its secrecy, as detailed above.  To obtain access to the database containing the CoStar's trade secrets, CoStar's customers pay a significant subscription fee.

121.    At all times, CoStar has taken reasonable measures to keep secret its trade secrets, including without limitation by limiting access to licensed users, requiring licensed users to

maintain the confidentiality of CoStar's trade secrets, and requiring licensed users to access CoStar's trade secrets through a password-protected portal.  CoStar has detailed these efforts above.

122.    CoStar did not consent to Defendants acquiring, using, or disclosing CoStar's trade secrets except as provided in the Baron Realty License Agreement and Terms of Use.

123.    Baron Realty promised under the Baron Realty License Agreement, and Shapiro, Pascal, Navarro, and Martini promised under the Terms of Use, that they would not copy or scrape CoStar's trade secrets and would preserve the confidentiality of CoStar's trade secrets.  At all relevant times, Baron Realty, Shapiro, Pascal, Navarro, Imaginary Wave Technology, and Martini knew CoStar's trade secrets were confidential.

124.    The Doe Defendants knew or had reason to know that CoStar's trade secrets were subject to a duty of confidentiality.

125.    Defendants knowingly used improper means to acquire, use, or disclose CoStar's trade secrets.  Specifically, Baron Realty, Shapiro, Pascal, Imaginary Wave Technology, and Martini used data-extraction technology to acquire trade-secret-protected data from CoStar's database.  Baron Realty, Shapiro, and Pascal put the information they extracted into a derivative database, which was used, or is being used, by Baron Realty, Shapiro, Pascal, Navarro, and the Doe Defendants.

126.    Defendants' conduct constitutes knowing, gross, and wanton misappropriation.

127.    As a result of Defendants' misappropriation of CoStar's trade secrets, CoStar has suffered and will continue to suffer damages, and Defendants were unjustly enriched, in an amount to be determined at trial.

128.    Defendants' misappropriation of CoStar's trade secrets has caused CoStar

irreparable injury.  Unless restrained and enjoined, Defendants will continue to misappropriate

CoStar's trade secrets.  As CoStar's remedies at law are inadequate, CoStar is entitled to

injunctive relief.

**FOURTH CLAIM FOR RELIEF**
**Copyright Infringement, 17 U.S.C. § 101 *et seq.***
**(Against Baron Realty and Shapiro)**

129.    CoStar repeats and realleges each and every allegation set forth above and

incorporates them herein by reference.

130.    Each of CoStar's photographs identified in Exhibit D (the "CoStar Photographs")

constitutes an original work of authorship and copyrightable subject matter under the laws of the

United States.

131.    CoStar owns or has exclusive rights to all rights, title, and interest in and to the

CoStar Photographs.

132.    Baron Realty and Shapiro had access to the CoStar Photographs under the Baron

Realty License Agreement.  The Baron Realty License Agreement permitted Baron Realty to use

on its own website photographs from CoStar's database depicting properties that Baron Realty

owns, controls, represents, or holds exclusives for until the termination of the Baron Realty

License Agreement.

133.    CoStar terminated the Baron Realty License Agreement on September 18, 2018.

134.    Baron Realty and Shapiro have copied, reproduced, republished, distributed to the

public, and/or displayed publicly the CoStar Photographs without the consent or authority of

CoStar after the termination of the Baron Realty License Agreement, thereby infringing CoStar's

copyrights.

135.    CoStar owns the exclusive rights in the CoStar Photographs and has validly

29

registered each of the CoStar Photographs with the United States Copyright Office either before Baron Realty's and Shapiro's acts of infringement or within three months of their first publication.  The registration number for each photograph is set forth in Exhibit D.

136.    Baron Realty's and Shapiro's copies, reproductions, republications, distributions, and displays are identical and/or substantially similar to the CoStar Photographs.

137.    Baron Realty is directly liable for these acts of infringement in violation of 17 U.S.C. §§ 106 and 501.

138.    Shapiro is jointly and severally liable for each act of Baron Realty's direct infringement because, on information and belief, he personally directed, participated in, and benefitted from Baron Realty's infringing conduct as alleged above.

139.    The infringement of CoStar's rights in each of its copyrighted photographs constitutes a separate and distinct act of infringement.

140.    Baron Realty's and Shapiro's acts of infringement have been willful, intentional, purposeful, and in disregard of CoStar's rights under the Copyright Act.  Baron Realty and Shapiro knew their acts were infringing, not least because of their publication and display of images that include CoStar's logo, and they intentionally or recklessly disregarded the law by their conduct.

141.    CoStar did not authorize Baron Realty's and Shapiro's acts.

142.    CoStar believes that additional instances of Baron Realty's and Shapiro's infringement of its copyrighted photographs will be revealed during the discovery process.

143.    As a result of Baron Realty's and Shapiro's willful copyright infringement, CoStar has been and will continue to be damaged as a direct and proximate result of the infringing acts set forth above, and Baron Realty and Shapiro have been unjustly enriched by

their unlawful infringement of CoStar's copyrighted photographs in an amount to be proven at trial.

144.    Baron Realty's and Shapiro's conduct also has caused irreparable and incalculable harm and injuries to CoStar and is ongoing.  Unless enjoined, Baron Realty's and Shapiro's conduct will cause further irreparable and incalculable injury, for which CoStar has no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF
### Contributory Copyright Infringement
### (Against Shapiro)

145.    CoStar repeats and realleges each and every allegation set forth above and incorporates them herein by reference.

146.    Baron Realty has directly infringed the CoStar Photographs, to which CoStar owns exclusive rights under copyright, by copying, reproducing, republishing, distributing to the public, and/or displaying publicly CoStar-copyrighted photographs owned by CoStar, without authorization from CoStar, or right under law, in violation of the Copyright Act.  Shapiro is liable as a secondary infringer under the Copyright Act for each act of direct infringement of CoStar's works by Baron Realty.

147.    Shapiro is liable under the Copyright Act for the infringing acts of Baron Realty as a contributory copyright infringer.  Shapiro had actual and constructive knowledge of Baron Realty's infringement of CoStar's copyrighted works.  Despite having that knowledge, Shapiro continued to cause, contribute materially to, and/or induce that infringement as set forth above. Without the active and material contributions from Shapiro, the infringement CoStar details above could not have taken place.  Shapiro is therefore contributorily liable for Baron Realty's direct infringement of CoStar's copyrighted works in violation of the Copyright Act.

148.     Shapiro likewise is liable for the acts of infringement identified above for acting in concert with Baron Realty to operate the Baron Realty website and for personally directing, participating in, and benefitting from Baron Realty's infringing conduct as alleged herein.

149.     Shapiro's acts of contribution to copyright infringement have been willful, intentional, purposeful, and in disregard of CoStar's rights under the Copyright Act.  Shapiro knew that his acts were infringing and intentionally or recklessly disregarded the law by his conduct.

150.     CoStar did not authorize Shapiro's acts.

151.     CoStar believes that additional instances of Baron Realty's infringement of its copyrighted photographs will be revealed during the discovery process.

152.     As a result of Shapiro's willful contribution to copyright infringement, CoStar has been and will continue to be damaged as a direct and proximate result of the infringing acts set forth above, and Shapiro has been unjustly enriched by his unlawful infringement of CoStar's copyrighted materials in an amount to be proven at trial.

153.     Shapiro's conduct also has caused irreparable and incalculable harm and injuries to CoStar and is ongoing.  Unless enjoined, Shapiro's conduct will cause further irreparable and incalculable injury, for which CoStar has no adequate remedy at law.

**SIXTH CLAIM FOR RELIEF**
**Breach of Contract**
**(Against Baron Realty)**

154.     CoStar repeats and realleges each and every allegation set forth above and incorporates them herein by reference.

155.     Baron Realty and CoStar entered into the Baron Realty License Agreement on December 11, 2017.

156.    The Baron Realty License Agreement provided that Baron Realty would pay to CoStar license fees and all other fees provided in the Baron Realty License Agreement.

157.    The Baron Realty License Agreement provided that Baron Realty would allow only individuals authorized by CoStar to access CoStar's database and that Baron Realty would not permit authorized users to share their access credentials with other persons.

158.    The Baron Realty License Agreement prohibited Baron Realty from copying, scraping, or creating derivative works of CoStar's database.

159.    The Baron Realty License Agreement prohibited Baron Realty from storing, copying, or exporting any portion of CoStar's database into any database or other software program.

160.    The Baron Realty License Agreement prohibited Baron Realty from using any portion of CoStar's database to create, directly or indirectly, any database or product.

161.    The Baron Realty License Agreement required Baron Realty to cease use of CoStar's database, information, and photographs after termination of the Baron Realty License Agreement.

162.    The Baron Realty License Agreement required Baron Realty to permanently delete or destroy all elements of CoStar's database under Baron Realty's control within ten days of the termination of the Baron Realty License Agreement.

163.    CoStar has performed all of the conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Baron Realty License Agreement.

164.    Baron Realty breached the Baron Realty License Agreement by, among other things:  failing to pay license fees; allowing an unauthorized person to use credentials issued to a

Baron Realty authorized user; copying or scraping CoStar's database; copying or exporting information taken from CoStar's database into a database or other software; and keeping and using information taken from CoStar's database after the termination of the Baron Realty License Agreement.

165.    As a result of Baron Realty's breaches of the Baron Realty License Agreement, Baron Realty has caused damage to CoStar in an amount to be determined at trial.

**SEVENTH CLAIM FOR RELIEF**
**Breach of Contract**
**(Against Shapiro, Pascal, Navarro, and Martini)**

166.    CoStar repeats and realleges each and every allegation set forth above and incorporates them herein by reference.

167.    Every time Shapiro, Pascal, Navarro, and Martini logged in to CoStar's database, they agreed to be bound by CoStar's Terms of Use.

168.    The Terms of Use prohibit each authorized user from allowing anyone else to use their credentials to access CoStar's database.

169.    The Terms of Use prohibit individuals from using credentials belonging to another person to access CoStar's database.

170.    The Terms of Use prohibit everyone from copying, scraping, using any data mining, gathering or extraction tool, or any robot, spider or other automatic device or manual process, to monitor or copy CoStar's database, or creating derivative works of CoStar's database.

171.    The Terms of Use prohibit everyone from storing, copying, or exporting any portion of CoStar's database into any database or other software program.

172.    The Terms of Use prohibit everyone from using any portion of CoStar's database to create, directly or indirectly, any database or product.

173.     The Terms of Use require everyone to cease use of any portion of CoStar's database, information, and photographs after termination of the applicable Baron Realty License Agreement.

174.     The Terms of Use require everyone to permanently delete or destroy all elements of CoStar's database under that user's control after the termination of the applicable Baron Realty License Agreement.

175.     CoStar has performed all of the conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of CoStar's Terms of Use.

176.     Shapiro, Pascal, and Martini breached CoStar's Terms of Use by, among other things, copying or scraping CoStar's database and copying or exporting information taken from CoStar's database into a database or other software.

177.     Shapiro, Pascal, and Navarro breached CoStar's Terms of Use by, among other things, using information taken from CoStar's database after the termination of the applicable Baron Realty License Agreement.

178.     Shapiro and Navarro breached CoStar's Terms of Use by, among other things, allowing an unauthorized person to gain access to CoStar's database by using credentials issued to a Baron Realty authorized user.

179.     Martini breached CoStar's Terms of Use by, among other things, using the credentials of another person to gain access to CoStar's database.

180.     As a result of Shapiro's, Pascal's, Navarro's, and Martini's breaches of CoStar's Terms of Use, Shapiro, Pascal, Navarro, and Martini have caused damage to CoStar in an amount to be determined at trial.

## EIGHTH CLAIM FOR RELIEF
**Fraud**
**(Against Martini—in the Alternative to the Seventh Claim for Relief Against Martini)**

181.    CoStar repeats and realleges each and every allegation set forth above and incorporates them herein by reference.

182.    Martini made multiple false statements of material fact to CoStar by representing that he was Shapiro or Navarro, who were authorized users under Baron Realty's license. Specifically, when directed to "[l]og In with *your* current CoStar username and password" (emphasis added), Martini repeatedly provided CoStar with credentials belonging to Shapiro or Navarro.  In so doing, Martini fraudulently misrepresented his identity.

183.    Martini knew that his representations were false and misleading.

184.    Martini made these false representations with the intent to deceive CoStar and thereby gain unauthorized access to the subscription database.

185.    CoStar reasonably relied upon Martini's misrepresentations when it granted Martini access to its database.

186.    As a direct and proximate result of Martini's conduct, CoStar has been damaged in an amount to be proven at trial.

## NINTH CLAIM FOR RELIEF
**Unfair Competition**
**(Against Defendants)**

187.    CoStar repeats and realleges each and every allegation set forth above and incorporates them herein by reference.

188.    Defendants' bad-faith misappropriation of the CoStar database and other confidential and proprietary material possessed by CoStar, and their improper use of the misappropriated material, constitutes an unfair and unjustifiable attempt to profit from the labors,

skills, and expenditures of CoStar.  Defendants exploited the exclusive commercial advantage

CoStar has through its unparalleled research of commercial real estate.

189.    Defendants' acts constitute unfair competition against CoStar under the laws of

the State of New York.

190.    Defendants' unfair competition was willful.

191.    By virtue of Defendants' unfair competition, CoStar is entitled to compensatory

and punitive damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, CoStar prays for judgment as follows:

A.     For an award against Defendants under 18 U.S.C. § 1836(b)(3), including

exemplary damages, and against Martini and Imaginary Wave Technology for aiding and

abetting violations of 18 U.S.C. § 1836;

B.     For an award against Baron Realty and Shapiro under 17 U.S.C. § 504(b) of

compensatory damages and the infringer's profits or, as CoStar may elect at any time before final

judgment is rendered, statutory damages under 17 U.S.C. § 504(c);

C.     For an award of damages and disgorgement against Defendants arising from

Defendants' misappropriation of CoStar's trade secrets;

D.     For an award of damages against Baron Realty arising from Baron Realty's

breaches of the Baron Realty License Agreement and the misappropriation of CoStar data as a

result of those breaches;

E.     For an award of damages against Shapiro, Pascal, Navarro, and Martini arising

from Shapiro's, Pascal's, Navarro's, and Martini's breaches of the Terms of Use, and the

misappropriation of CoStar data as a result of those breaches; or, as to Martini, in the alternative,

for an award of damages arising from Martini's materially false representations and the

unauthorized access to CoStar's proprietary database that resulted from such misrepresentations;

F.       For an award of damages against Defendants arising from Defendants' unfair

competition;

G.       For a permanent injunction (1) barring Defendants' continued unauthorized use of

any information acquired from CoStar's database; (2) barring Baron Realty and Shapiro's

continued publication of photographs owned by CoStar; and (3) ordering Defendants to purge all

CoStar content from any computers, databases, or servers that they use or maintain;

H.       For further permanent injunctive relief as deemed necessary by the Court;

I.       For an award of CoStar's costs, including its reasonable attorney's fees and

disbursements of counsel, as permitted by law;

J.       For prejudgment and post-judgment interest according to law;

K.       For exemplary and punitive damages to the extent available; and

L.       For such further and additional relief as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

CoStar demands a trial by jury on all issues properly tried to a jury.

Dated:  March 11, 2019            Respectfully submitted,


            By: /s/  Lisa C. Cohen

            Lisa C. Cohen (N.Y. Bar 2204287)
            Jonathan L. Hochman (N.Y. Bar 2256972)
            SCHINDLER COHEN & HOCHMAN LLP
            100 Wall Street, 15th Floor
            New York, NY 10005
            Telephone:  (212) 227-6300
            Facsimile:  (212) 277-6333
            lcohen@schlaw.com
            jhochman@schlaw.com

            Nicholas J. Boyle (*pro hac vice* forthcoming)
            David R.J. Riskin (*pro hac vice* forthcoming)
            WILLIAMS & CONNOLLY LLP
            725 Twelfth Street, N.W.
            Washington, DC 20005
             Telephone:  (202) 434-5000
            Facsimile:  (202) 434-5029
            nboyle@wc.com
            driskin@wc.com

            *Attorneys for CoStar Group, Inc. and CoStar Realty Information, Inc.*